## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

BETH GOUSE,

       *Plaintiff*,

    v.

DISTRICT OF COLUMBIA,

       *Defendant*.

Civil Action No. 17-2566 (RDM)

## MEMORANDUM OPINION AND ORDER

Plaintiff, a former employee of Saint Elizabeths Hospital in Washington, D.C., seeks documents relating to findings contained in a portion of a report issued by the D.C. Office of the Auditor ("Auditor"), which was prepared with the assistance of the Council for Court Excellence ("CCE"). Dkt. 20. Those findings and the investigation on which they were premised arguably bear on Plaintiff's claims that she was not selected to serve as the Chief Executive Officer ("CEO") of Saint Elizabeths and, after having served as the interim CEO, was not reinstated to her prior position as Chief Clinical Officer because of her race and sex and because she had engaged in protected equal employment opportunity activity. Dkt. 1 at 2–3 (Compl. ¶¶ 4–5). The Auditor and CCE ("movants") have filed a joint motion to quash Plaintiff's subpoenas on three grounds. They first, and most extensively, argue that the subpoenas seek documents protected by the District's Speech or Debate Statute, D.C. Code. § 1-301.42, which is modeled on the Speech or Debate Clause of the U.S. Constitution, art. I, § 6, cl. 1. Dkt. 20 at 10–21. Second, they invoke the deliberative process privilege. *Id*. at 24. Third, they contend that the subpoenas are unduly burdensome and that, at a minimum, Plaintiff should be required to exhaust the ordinary discovery process before burdening non-parties. *Id*. at 22–25.

As explained below, the Court is unconvinced that the specific documents at issue are protected by the Speech or Debate Statute.  At the same time, much of what Plaintiffs seeks *might* be protected by the deliberative process privilege, and it is also *possible* that the subpoenas are, at least in part, unduly burdensome or repetitive of discovery that Plaintiff may be able to obtain in the ordinary course.  On the present record, however, movants have not carried their burden of demonstrating that any specific documents are privileged or that the subpoenas are unduly burdensome.  The Court will, accordingly, deny the pending motion to quash.  But, in light of the sensitivities posed by discovery seeking, among other things, notes of interviews of current and former employees expressing their candid assessment of other government employees and officials, the Court will grant movants leave to file an amended motion to quash on grounds of deliberative process privilege and undue burden supported by a more detailed showing.

## I. BACKGROUND

### A.    Factual Background

Plaintiff Beth Gouse, a Caucasian woman, worked as a clinical psychologist at Saint Elizabeths Hospital in Washington, D.C. from 1993 until 2016.  Dkt. 1 at 1–2 (Compl. ¶¶ 1–4).  During her tenure at Saint Elizabeths, Dr. Gouse received a number of promotions, eventually becoming Chief Clinical Officer in 2013.  *Id.* at 1 (Compl. ¶ 1).  In June 2015, Gouse was named interim CEO of the hospital, and one month after starting her interim position, she applied for the permanent CEO position.  *Id.* (Compl. ¶ 1).  In February 2016, however, the Director of the D.C. Department of Behavior Health ("DBH") informed Gouse that she had not been selected, *id.* at 10 (Compl. ¶ 48), and Gouse later learned that the Director had chosen another applicant, Dr. James Kyle, for the CEO position, *id.* at 11 (Compl. ¶ 52).  When Gouse requested to return to

her previous role as Chief Clinical Officer, Saint Elizabeths informed Gouse that her employment would be terminated in March 2016. *Id.* at 11–12 (Compl. ¶¶ 53–55).

Gouse alleges that her treatment was the result of discrimination based on race, sex, and reprisal. *Id.* at 2–3 (Compl. ¶ 5). She seeks to prove her case by demonstrating, in part, that Dr. Kyle, an African American male, "was not as qualified" as she was for the CEO position, *id.* at 2 (Compl. ¶ 2), and that the Director of DBH re-assigned several of Gouse's job duties to an African American female, Dr. Johnson, even though Dr. Johnson "had no supervisory authority to provide oversight or management of Saint Elizabeths patients," *id.* at 7 (Compl. ¶ 34), and was allegedly "investigated for abuse" due to her "behavior towards patients and staff," *id.* at 6–7 (Compl. ¶¶ 30–31).

**B.      The D.C. Auditor and the Auditor's Report**

The Office of the District of Columbia Auditor is a position that exists pursuant to the District of Columbia's Charter. *See* D.C. Code § 1-204 *et seq.* The Auditor is "appointed by the Chairman" of the D.C. Council—the District's legislative branch—"subject to the approval of a majority of the Council," D.C. Code § 1-204.55(a), and is charged with "conduct[ing] a thorough audit of the accounts and operations of the government of the District in accordance with such principles and procedures and under such rules and regulations as [the Auditor] may prescribe." *Id.* § 1-204.55(b). In carrying out these duties, the Auditor has "access to all books, accounts, records, reports, findings and all other papers, things, or property belonging to or in use by any department, agency, or other instrumentality of the District government and necessary to facilitate the audit." *Id.* § 1-204.55(c). Once finalized, the Auditor must "submit his [or her] audit reports to the Congress, the Mayor, and the Council." *Id.* § 1-204-55(d). Those reports "shall include such comments and information as the District of Columbia Auditor may deem necessary to keep the Congress, the Mayor, and the Council informed of the operations to which

the reports relate" and shall contain "such recommendations with respect thereto as [s]he may deem advisable." *Id.* After receiving the report, the Council must make the "report, together with such other material as it deems pertinent thereto, available for public inspection." *Id.* § 1-204.55(e). The statute further requires that the "Mayor . . . state in writing to the Council, within an appropriate time, what action" she has "taken to effectuate the recommendations made by the District of Columbia Auditor" in the reports. *Id.* § 1-204.55(f).

About three months after Plaintiff filed this lawsuit, the Auditor issued a report entitled *Improving Mental Health Services and Outcomes for All: The D.C. Department of Behavioral Health and the Justice System* ("Report"). *See* Dkt. 22 at 12–39 (excerpts of the Report).[1] As the Auditor explained in the cover letter conveying the report to Councilmembers Vincent Gray and Charles Allen, the Report was prepared by CCE "for the Office of the D.C. Auditor" and was designed to provide "a comprehensive review of the Department of Behavioral Health . . . and its work with justice-involved individuals and with the criminal justice system as a whole." *Id.* at 17. CCE is a "nonprofit, nonpartisan civic organization" that "identifies and proposes solutions by collaborating with diverse stakeholders to conduct research, advance policy, educate the public, and increase civic engagement." Dkt. 20-2 at 12.

Although the 175-page Report addresses a wide range of topics, including "[f]unding [i]ssues," "[m]ethods of [d]elivery," and "[f]orensic [p]rocesses," *id.* at 14, Gouse's interest in the Report is limited to five pages, which discuss "the performance of DBH leadership" in the

---

[1] The Court takes judicial notice of the report, *Improving Mental Health Services and Outcomes for All: The D.C. Department of Behavioral Health and the Justice System*, available at http://dcauditor.org/wp-content/uploads/2018/09/DBH.Report.2.26.18.pdf (hereinafter "Report"). Although the entire report was not filed with the Court, both parties cite to portions of the report, and there is no reason to doubt the authenticity of the full report contained on the Auditor's website.

time surrounding her termination.  *See* Dkt. 22 at 41 (quoting Dkt. 20-2 at 16).  The relevant

passages can be reproduced in full:

> [A]s reported to CCE by several interviewees, one of the most notable actions
> by the current Directors was their termination of and request for the resignation
> of several members of DBH and [Saint Elizabeths Hospital] upper management
> who had helped see the Department through significant improvements,
> including exiting federal oversight.  For example, in early 2016, the Mayor and
> the Director of DBH replaced the interim CEO [Gouse], a forensic psychologist
> with 20 years of experience at the hospital who had helped see the hospital
> through the U.S. Department of Justice (DOJ) oversight, with a candidate who
> seriously misrepresented his credentials and was not qualified for the position.
> In fact, D.C. regulators had previously found the candidate unqualified to work
> at the University of the District of Columbia as the "[Registered Nurse] director
> of nursing for non-credit programs," a position to which the Executive Office of
> the Mayor also appointed him.

*Id.* at 34.  The "candidate" referred to is Dr. Kyle, the individual ultimately selected as CEO.  A

few pages later, the Report discusses Dr. Johnson, the Director of DFS, who Gouse alleges

received several of Gouse's job duties:

> Almost everyone with whom CCE spoke raised concerns about the management
> style and behavior of the Director of DFS.  Current and former DBH staff,
> stakeholders, CSA staff, and consumer advocates described the management
> style and behavior as "vindictive," "punitive," "volatile," and "adversarial."
> Many expressed concerns about the number of staff and patient complaints filed
> against the Director.  Many DFS staff agreed to speak with CCE only on the
> condition of anonymity, asserting a fear of retribution from the DFS Director.
>
> . . . .
>
> Moreover, after investigating six complaints filed against the Director in 2008
> ranging from lack of professional deportment to verbal abuse of staff and
> patients, DBH's Office of Accountability issued a 10-page report that reached
> the following conclusions:
>
>> . . . the overall findings of this report support the position that [the
>> current Director of DFS] behaved in a manner towards patients and
>> staff members that could reasonably be considered to be argumentative,
>> loud, offensive, abusive, and unprofessional. . . .
>
> Despite the findings of that report, the Director of DFS was promoted to their
> current position.  Court records further show that in FY 2017, the Director of

DFS was the target of two Equal Employment Opportunity (EEO) complaints, which DBH asserted were both unsubstantiated.

*Id.* at 38.

## C.      Procedural History

After discovery commenced, Plaintiff served subpoenas on both CCE and the Auditor. The subpoena served on the Auditor sought thirteen categories of records, Dkt. 20-2 at 6–8, and the subpoena directed to CCE sought "[c]ommunications and documents that relate to the allegations and findings contained" in the above sections of the report, "including [their] investigative report, notes, witness statements, interviews, etc.," Dkt. 20-3 at 1.  Subsequently, as part of the meet and confer process, Plaintiff agreed to narrow the Auditor's subpoena to seek the same documents she seeks from CCE.  Dkt. 22 at 41.

CCE and the Auditor move to quash the subpoenas pursuant to Fed. R. Civ. P. 26(b)(1) and 45(d)(3), on grounds of the District's Speech or Debate Statute, the deliberative process privilege, and undue burden.  Dkt. 20.

## II.  LEGAL STANDARD

Federal Rule of Civil Procedure 45 mandates that a district court quash an otherwise valid third-party subpoena if the subpoena "requires disclosure of privileged or other protected matter, if no exception or waiver applies" or "subjects a person to undue burden."  Fed. R. Civ. P. 45(d)(3)(A)(iii)–(iv).  In considering whether a subpoena subjects a person to an "undue burden," courts must also consider Rule 26, which provides, in relevant part, that parties may seek "discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case."  Fed. R. Civ. P. 26(b)(1).  "If a subpoena compels disclosure of information that is not properly discoverable, then the burden it imposes, however slight, is necessarily undue."  *AF Holdings, LLC v. Does 1-1058*, 752 F.3d 990, 995

(D.C. Cir. 2014).  The burden of "proving that a subpoena is oppressive is on the party moving to quash," and a party seeking to quash a subpoena based on the invocation of privilege "must adequately demonstrate that applicable privileges would in fact protect" the material sought. *Northrop Corp. v. McDonnell Douglas Corp*., 751 F.2d 395, 403 (D.C. Cir. 1984).

### III.  ANALYSIS

The Auditor and CCE move to quash the subpoenas at issue on three grounds.  First, they argue that they are entitled to legislative immunity under the District's Speech or Debate Statute. Second, they contend that the documents are protected from disclosure under the deliberative process privilege.  Third, they argue that the subpoenas are unduly burdensome.  The Court will address each argument in turn.

### A.  Legislative Immunity

#### 1.  *The District's Speech or Debate Statute*

Movants devote the bulk of their motion to the contention that the subpoenas seek discovery of documents that are protected by the D.C. Speech or Debate Statute.  Dkt. 20 at 4. That statute provides: "For any speech or debate made in the course of their legislative duties, the members of the Council shall not be questioned in any other place."  D.C. Code. § 1-301.42. As the text reflects, the statute is "modelled upon the 'speech and debate' clause of the Constitution of the United States," *Gross v. Winter*, 876 F.2d 165, 173 (D.C. Cir. 1989) (citation omitted), which, in similar terms, provides that "for any Speech or Debate in either House" of Congress, Members of Congress "shall not be questioned in any other place," U.S. Const., art. I, § 6, cl. 1.  Courts, accordingly, look to precedent interpreting the U.S. Constitution's Speech or Debate Clause in "construing the District's analogous statute."  *All. for Glob. Justice v. Dist. of Columbia*, 437 F. Supp. 2d 32, 35 (D.D.C. 2006).

The Framers adopted the Speech or Debate Clause to "reinforc[e] the separation of powers" by "insur[ing] that the legislative function . . . allocate[d] to Congress may be performed independently." *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 502 (1975). To that end, the clause was not "written into the Constitution simply for the personal benefit of Members of Congress, but to protect the integrity of the legislative process by insuring the independence of individual legislators." *United States v. Brewster*, 408 U.S. 501, 507 (1972). Moreover, because Members of Congress cannot "perform their legislative tasks without the help of aides and assistants," *Gravel v. United States*, 408 U.S. 606, 616 (1972), courts have long-recognized that the immunity extends not just to the legislators themselves but to "staff," "consultant[s]," or "investigator[s]" as well, *Doe v. McMillan*, 412 U.S. 306, 312 (1973). And, because "discovery procedures can prove just as intrusive" on the "time, energy, and attention" of legislators and their assistants as defending a civil action, Speech or Debate protection extends to the enforcement of third-party subpoenas in civil litigation. *MINPECO, S.A. v. Conticommodity Servs., Inc.*, 844 F.2d 856, 859 (D.C. Cir. 1988). Significantly, this protection is "absolute." *Eastland*, 421 U.S. at 503. If "the action at issue . . . was undertaken within the 'legislative sphere,'" the immunity attaches without requiring that the legislator or the court balance the burden imposed against the need for the discovery. *MINPECO, S.A.*, 844 F.2d at 860. The Speech or Debate Clause must also be read "broadly to effectuate its purposes." *Eastland*, 421 U.S. at 501.

"The 'broad' reading given to the Speech or Debate Clause, however, is not boundless." *Williams v. Johnson*, 597 F. Supp. 2d 107, 113 (D.D.C. 2009) (citation omitted). "In defining the[] categories of protected conduct, the [Supreme] Court has been careful not 'to extend the privilege beyond its intended scope, its literal language, and its history, to include all things in

any way related to the legislative process.'" *Fields v. Office of Eddie Bernice Johnson*, 459 F.3d 1, 10 (D.C. Cir. 2006) (quoting *Brewster*, 408 U.S. at 516). Most notably, the Clause "protects only those congressional acts properly thought to fall within the legislative function—those 'generally done in a session of the House by one of its Members in relation to the business before it.'" *Brown & Williamson Tobacco Corp. v. Williams*, 62 F.3d 408, 415 (D.C. Cir. 1995) (quoting *Kilbourn v. Thompson*, 103 U.S. 168, 204 (1881)). Thus, "[i]n determining whether legislative immunity applies, the critical question is whether the action at issue was undertaken within the 'legislative sphere.'" *All. for Glob. Justice*, 437 F. Supp. 2d at 36 (citation omitted).

The D.C. Circuit has articulated a "nonexhaustive list" of protected actions, including, "at the least . . . delivering an opinion, uttering a speech, or haranguing in debate; proposing legislation; voting on legislation; making, publishing, presenting, and using legislative reports; authorizing investigations and issuing subpoenas; and holding hearings and introducing material at Committee hearings." *Jewish War Veterans of the U.S., Inc. v. Gates*, 506 F. Supp. 2d 30, 53 (D.D.C. 2007) (quoting *Fields*, 459 F.3d at 11). The D.C. Code, likewise, includes an illustrative list of "[l]egislative duties" to which the Speech and Debate Statute applies. The Code enumerates "the responsibilities of each member of the Council in the exercise of such member's functions as a legislative representative," including "but not limited to: Everything said, written or done during legislative sessions, meetings, or investigations of the Council or any committee of the Council, and everything said, written, or done in the process of drafting and publishing legislation and legislative reports." D.C. Code § 1-301.41(b). These lists track the Supreme Court's admonition that, although "[l]egislative acts" encompass more than "literal speech or debate," only those acts that constitute "'an integral part of the deliberative (or) communicative processes by which Members participate in committee and House proceedings' with respect to

matters before the" legislature, qualify for protection. *McSurely v. McClellan*, 553 F.2d 1277, 1286 (D.C. Cir. 1976) (en banc) (quoting *Gravel*, 408 U.S. at 625).

With this framework in mind, the Court now turns to the D.C. Auditor's report.

2.      *The Documents Used to Draft the Auditor's Report*

The subpoenas at issue here seek notes, witness statements, interviews, and other documents that relate to the findings contained on pages 32–36 of the Report. According to movants, these documents are just the type of materials that are protected by the D.C. Speech or Debate Statute. Although the Court assumes (but need not decide) that some of the materials collected or created in the course of preparing the Report are protected, it is not convinced that the specific findings presently at issue implicate the Speech or Debate Statute.

Movants first contend that because "[t]he Auditor is a component of the legislative branch of the District government[,] its investigations are . . . inherently tied to the legislative process" and thus immune from discovery. Dkt. 25 at 2. As they correctly observe, the Report declares that the "mission" of the Office of the District of Columbia Auditor "is to support the Council of the District of Columbia by making sound recommendations that improve the economy, efficiency, and accountability of the District government." Dkt. 22 at 13; *see also* Dkt. 25 at 2 (quoting Auditor's Policy and Procedure Manual at 2–3) (noting that the Auditor is required to "[s]upport the Council of the District of Columbia in its legislative and oversight roles with timely and comprehensive audits and special reports that help the Council make sound policy and protect the District's financial health"). The statute creating the Office of the District of Columbia Auditor, moreover, vests the Chairman of the Council with the authority to appoint the Auditor, subject to the approval of a majority of the Council. D.C. Code § 1-204.55(a). As the House Committee on the District of Columbia explained when Congress adopted the District

of Columbia Self-Government and Governmental Reorganization Act, the Office of the District of Columbia Auditor was created to "to audit the books of the District of Columbia *on behalf of the city council or the legislative branch of the District of Columbia*," and the relationship between the Auditor and the Council was "modeled after the" relationship between the Government Accountability Office and the Congress. *See* H.R. Rep. No. 93-482, at 30 (1973) (emphasis added).

This, however, tells only part of the story. To be sure, the Auditor at times—and, perhaps, most of the time—operates on behalf of the Council, conducting audits and preparing reports to aid the Council in the discharge of its legislative duties. But the Auditor's statutory charge extends beyond that: the Auditor is also required to "submit h[er] audit reports to the . . . the Mayor," to include information and comments in those reports that she deems "necessary to keep" the Mayor apprised about the "operations to which the reports relate," and to make recommendations to the Mayor as she "deem[s] advisable." D.C. Code § 1-204.55(d). After receiving such a recommendation, moreover, the Mayor is required to "state in writing to the Council . . . what action [s]he has taken to effectuate the recommendation[.]" *Id.* at § 1-204.55(f). The statute, in other words, contemplates that the Auditor will not only make recommendations to the legislative branch (the Council) but also to the executive branch (the Mayor).[2]

That is precisely what the Auditor did in this case—she made recommendations to both branches of the D.C. government. As movants stress, and as Plaintiff concedes, the Report includes numerous recommendations to the Council. Dkt. 25 at 2–3 & n.2. The Report, for

---

[2] The statute also contemplates that the Auditor will provide information and make recommendations to the U.S. Congress. That duty, however, is not at issue in this case.

example, recommends that the Council "elevat[e] the position of Director of DFS to that of a mayoral-level appointment," Report at 7, "increas[e] DFS funding," *id.*, "allocate additional clinical and direct services to DFS," *id.*, "augment[] DBH's IT infrastructure budget," *id.* at 25, "require DBH to produce strategic plans addressing the systemic and institutional failures mentioned in this and other reports," *id.* at 27, and "produce annual reports detailing progress in carrying out those plans," *id.* At the same time, however, the Report also includes an array of recommendations directed at the Office of the Mayor, DBH, and other D.C. agencies and offices. *See, e.g.*, *id.* at 20 (recommending that "the D.C. Office of Performance Management (OPM) develop and incorporate into DBH's annual Performance Accountability Report performance metrics that effectively capture and measure DBH's work with justice-involved consumers"); *id.* at 35 (recommending that the "Executive Office of the Mayor (a) review the performance of DFS management and assess DFS management's ability to carry out effectively the Division's obligations, and (b) to take appropriate action"); *id.* at 38 (recommending that "DBH consult with national experts who specialize in forensic training programs to develop a formal, rigorous forensic training program for current and future staff").

What matters for present purposes is whether the Auditor was acting in the "legislative sphere" (or as an extension of the Council) with respect to the narrow slice of the investigation and Report that interests Plaintiff. The relevant findings and recommendations show that she was not. The Auditor's discussion of the Mayor and DBH's decision to "replace" Plaintiff as CEO of Saint Elizabeths Hospital, notwithstanding her "20 years of experience at the hospital," for example, contains no legislative recommendations or proposals. Dkt. 22 at 32–34. It, instead, questions the judgment of "the current director" of DBH in making particular decisions relating to the "termination of and request for the resignation of several members of DBH and

12

[Saint Elizabeths Hospital] upper management," and it recommends that the Executive Office of the Mayor "conduct a thorough review of the performance of the current Director of DBH." *Id.* at 34. Similarly, the Report finds that DFS's "management has failed to . . . foster a healthy work environment in which staff can flourish," and it recommends that the Executive Office of the Mayor "review the performance of DFS management and assess DFS management's ability to carry out effectively the Division's obligations" and that, based on that review, the Mayor "take appropriate action." *Id.* at 35. In response to this portion of the Report, moreover, DBH noted that it "is restricted from commenting on personnel matters" but committed to take the Report "into account . . . in its own review of an individual's or division's performance." Report at 105.

Movants contend that the lack of any legislative recommendation or proposal relating to these findings is not dispositive because the Report does include legislative recommendations that "subsume[] the entirety of the report." Dkt. 25 at 4. They stress, in particular, that the Report makes the broad recommendations that the "Council require DBH to produce strategic plans addressing the systemic and institutional failures mentioned in this and other reports," and that the "Council require DBH to produce annual reports detailing progress in carrying out those plans." Dkt. 25 at 4 (quoting Report at 27). The suggestion that DBH be required to produce, and to follow, a "strategic plan," however, bears no discernible relationship to the Report's findings regarding the deficient hiring decisions that interest Plaintiff. As the commentary accompanying the "strategic plan" recommendation explains, these recommendations are intended to address "systemic and institutional failures pertaining to justice-involved consumers that have persisted for years, including DBH's inability to stem the flow of forensic inpatient admissions for [Saint Elizabeths Hospital] for competency evaluations and restoration, to

13

improve forensic outpatient programs, and to provide for the timely discharge of patients within the most integrated, least-restrictive appropriate setting." Report at 27. A "strategic plan" is necessary, according to the Report, because, after years of "judicial and [Department of Justice] oversight . . . DBH has largely functioned reactively, responding to standards established by others." *Id.* Moreover, to the extent this recommendation relates to staffing at all, it adresses a need better to allocate resources and to ensure that DBH has "sufficient qualified staff to meet the demand for forensic services." *Id*. at 29. Those types of "strategic" considerations, and a need for better planning, are distinctly forward looking; they are the antinomy of the recommendation that the Mayor review the past performance of the DBH Director to determine whether she made a series of bad hiring decisions.

Movants also argue that the absence of any legislative proposal or response to an investigation does not take the investigation outside the legislative sphere. That assertion is undoubtedly correct—and, indeed, the Court assumes that most legislative investigations do not ultimately lead to legislation. Framed in this manner, however, movants' argument begs the question whether the investigation fell within the legislative sphere to start. In support of their argument, movants point to this Court's decision in *Williams v. Johnson*, 597 F. Supp. 2d 107 (D.D.C. 2009), where this Court quashed subpoenas directed at a member of the D.C. Council and one of his aides seeking testimony and documents relating to the Council's oversight of the D.C. Addiction Prevention and Recovery Administration. *Id.* at 109. According to movants, *Williams* supports their position because the Court quashed the subpoenas without ever considering whether the informal investigation at issue in that case led to any "legislative measure." Dkt. 25 at 3. The Court did not address that issue because, as movants posit, the ultimate results of a legislative investigation are not what matters. But what does matter, and

what movants ignore, is the "critical question . . . whether the action at issue"—that is, the investigation itself—"was undertaken within the 'legislative sphere.'" *Williams*, 597 F. Supp. 2d at 113 (citation and internal quotation marks omitted). In *Williams*, the answer to that question was "yes" because the councilmember conducted a hearing, met with the plaintiff and her husband (along with two aides) "to discuss a matter raised at the hearing and to receive information concerning alleged wrongdoing at an agency," and "launch[ed] an investigation as a result of the information received." *Id.* at 116. As in *Williams*, the "critical question" presented here is whether the relevant portions of the investigation and Report served a *legislative* or *executive* function. The answer to that question, however, differs from the answer in *Williams*.

In most cases, deciding which side of the line an investigation falls upon will not be difficult. In *Williams*, for example, the investigation was both initiated and conducted by a councilmember and his staff, and it was unrelated to any executive function. Here, however, the analysis is not so easy because the Auditor is charged by statute with making recommendations both to the Council and to the Mayor, and because the investigation and Report supported both legislative and executive functions. There is no basis to conclude, moreover, that the relevant portions of the investigation and the Report were "undertaken within the 'legislative sphere.'" *All. for Glob. Justice*, 437 F. Supp. 2d at 36 (citation omitted). There is no evidence, for example, that the Council or any member requested that the Auditor investigate and report on the relevant hiring decisions. *See* D.C. Code § 1-301.41 ("Legislative duties shall include the responsibilities of each member of the Council in the exercise of such member's functions as a legislative representative, including but not limited to: Everything said, written or done during . . . investigations of the Council or any committee of the Council."). There is no evidence that the Auditor made any relevant recommendations to the Council or that the Council sought to follow

up on the relevant aspects of the Report. And, the only relevant findings and recommendations were directed to the Executive Office of the Mayor. Significantly, those findings and recommendations were distinctly executive in nature: the Report recommends that the Mayor's Office "review . . . the performance of the current Director of DBH," Dkt. 22 at 34, and, under D.C. law, the Director serves "at the pleasure of the Mayor," D.C. Code § 7-1141.03(3). The Court, as a result, lacks any basis to conclude that the relevant portions of the investigation and Report had anything to do with "the deliberative and communicative processes by which" members of the Council "participate in committee and [Council] proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which" the law "places within the jurisdiction of" the Council. *Gravel*, 408 U.S. at 625.

Movants attempt to counter this by noting that, "[d]uring the pendency of the investigation," they "made preliminary information available to Councilmember[s]" Gray and Allen; that upon release of the Report, they "transmitted it directly to Councilmembers Gray and Allen, who then held a joint oversight hearing;" that during the hearing, "CCE appeared and responded to questions on behalf of the Auditor and there was extensive discussion of the Report's findings;" and that "[t]hose findings were further addressed at DBH's subsequent budgetary hearings before the Council's Committee on Health, at which CCE again reported on and answered questions regarding the Report." Dkt. 25 at 6–7. There is no dispute, however, that portions of the investigation and Report fall within the "legislative sphere." But because the Report covered both legislative and executive ground, the Court must decide whether the portions of the investigation and Report that Plaintiff seeks fall within that sphere, and the Auditor and CCE fail to offer any evidence that they do. The "preliminary information" made available to members of the Council, for example, addressed "current and past year

commitments and spending by the Department of Behavioral Health," and offered "to set up a briefing . . . on the project on DBH underway by" CCE. Dkt. 20-5 at 1–2. Nothing in that correspondence or otherwise in the record includes any mention of the portions of the investigation and Report at issue here. Nor do movants point to any discussion of the relevant issues at the oversight or budgetary hearings. Although movants provide timestamps in a thirteen-hour video of the joint oversight committee and a six-hour video of the budget oversight hearing, the cited portions of the hearings feature CCE staff presenting high-level findings and policy recommendations. *See* Dkt. 25 at 6–7. If other portions of the hearings addressed the aspects of the Report at issue here, movants have not identified those portions for the Court.

Finally, movants' efforts to distinguish this Court's decision in *Payne v. District of Columbia*, 859 F. Supp. 2d 125 (D.D.C. 2012), are unavailing. In that case, Payne was terminated from his position as D.C. Director of Contracts, and he sued the District alleging wrongful termination, among other claims. In support of his claims, Payne sought discovery from two members of the D.C. Council, who he alleged "cajoled" the D.C. Chief Financial Officer ("CFO") into withdrawing a contract that Payne had awarded and "caused Payne's wrongful termination." *Id.* at 128. In response, the two councilmembers sought to quash the subpoenas directed at them based on the D.C. Speech or Debate Statute. The Court agreed in part and disagreed in part. To the extent Payne sought discovery regarding the councilmembers' efforts to "cajole" the D.C. CFO into withdrawing the contract, their communications were protected because the Council's legislative duties include reviewing and approving multiyear contracts in excess of a million dollars. *Id.* at 135. But, because "[c]ajoling" Payne's boss to "fire" him did not fall within the scope of the Council's duties, those portions of the councilmembers' communications were not protected. *Id.* As the Court explained, "[r]etention

or termination of Payne might have affected the best interests of District citizens, but that decision [was] an executive one." *Id.*

According to movants, *Payne* is inapposite for two reasons. First, "the investigation here was undertaken primarily for the benefit of the Council in the performance of its legislative responsibilities and . . . only 'part of the audit report objectives involve[] recommendations for the executive branch.'" Dkt. 25 at 7 (quoting Dkt. 22 at 6 n.4). But that argument amounts to little more than ipse dixit, and, in fact, a large portion of the Report—including the portion at issue here—involved recommendations for the executive branch. Second, movants contend that the recommendations at issue here "in no way represent an effort to 'cajole' specific agency action with respect to a particular matter, as opposed to the more general 'pursu[it of] legislative business.'" *Id.* at 8 (quoting *Payne*, 859 F. Supp. 2d at 135). Although the word "cajole" might not apply here, the concept that *Payne* articulated does: As in *Payne*, the relevant portions of the investigation and Report raise concerns about particular executive branch employees, and the Report urges the executive branch official with authority to act to look into the asserted deficiencies.

Finally, movants contend that the recommendations at issue here might well entail legislative action. They assert, for example, that implementing the recommendations that the Executive Office of the Mayor review the performance of the current Director of DBH and the performance of DFS management would "require Council funding and implementing legislation at the outset." Dkt. 25 at 8. All executive action, to be sure, requires funding. But the Report contains no suggestion that any special funding would be required to permit the Mayor to review the performance of the identified officials, and it proves too much to suggest that every executive action—or recommendation for executive action—falls within the legislative sphere merely

because the action requires the executive to use generally available appropriations. Nor is the Court convinced that the recommendations are legislative in nature because the Council might decide to legislate "in the event the executive fails to take" the recommended "action." *Id.* Movants are correct that much of the legislative oversight process involves staying abreast of what is occurring in the executive branch. But, where (1) the Council did not instigate the relevant portions of the investigation; (2) the Auditor is charged by statute with making recommendations to both the Council and the Mayor; (3) the relevant portions of the investigation and Report focused on executive functions and made recommendations for executive actions; and (4) there is no indication that the Mayor had—or would—decline to follow the Auditor's recommendations, the Court cannot conclude that the investigation falls within the protected, legislative realm.

Most fundamentally, the question for the Court is whether the subpoenas even remotely threaten "the integrity of the legislative process" or the "independence" of the Council to investigate and legislate as it sees fit. *Brewster*, 408 U.S. at 507. One relevant—and, indeed, indispensable—indicia of such an intrusion is the view of the Council itself. As the Supreme Court observed in *Gravel*, although the Speech or Debate privilege is applicable to those who assist members of the legislature, the privilege belongs to the members and is "invocable only by" a member or an aide asserting the privilege on the member's behalf. 408 U.S. at 621–22. Here, the Council has not joined movants in seeking to quash the subpoenas, nor is there any evidence that it (or that any member of the Council) has authorized the Auditor to assert the privilege on the Council's behalf. To the contrary, Plaintiff represents that she also served a subpoena on the Council and that the Council responded without invoking legislative immunity.

Dkt. 22 at 3 & n.2.  Although the record says little about the issue, movants do not dispute this assertion.

The Court, accordingly, must reject movants' invocation of legislative immunity to quash the subpoenas in their entirety.

## B.      Deliberative Process Privilege and Undue Burden

That conclusion, however, does not end the Court's inquiry.  Movants make two additional arguments, albeit only briefly.  First, they invoke the deliberative process privilege as alternative grounds for quashing the subpoena.  Second, they argue that—regardless of any specific privilege—the subpoena is overly burdensome.  As the record currently stands, however, the Court lacks sufficient information to determine whether either objection applies.

The deliberative process privilege protects "documents 'reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated.'" *N.L.R.B. v. Sears, Roebuck & Co.,* 421 U.S. 132, 150 (1975) (quoting *Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena*, 40 F.R.D. 318, 324 (D.D.C. 1966)).  The "privilege rests on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news, and its object is to enhance 'the quality of agency decisions,' . . . by protecting open and frank discussion among those who make them within the Government."  *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8–9 (2001) (citations omitted).  "The deliberative process privilege covers communications that are pre-decisional and deliberative."  *Nat'l Sec. Archive v. C.I.A.*, 752 F.3d 460, 463 (D.C. Cir. 2014).  A record "is predecisional if it was 'prepared in order to assist an agency decisionmaker in arriving at his decision, rather than to support a decision already made,'" and it is "deliberative if it 'reflects the give-and-take of the

consultative process.'" *Petroleum Info. Corp. v. U.S. Dep't of Interior*, 976 F.2d 1429, 1434 (D.C. Cir. 1992) (citations omitted).

Movants stress that courts have applied the deliberative process privilege to governmental entities that perform investigative and recommendatory functions similar to those performed by the D.C. Auditor, including the Government Accountability Office (GAO)—the office on which the Office of the Auditor is modelled. *See Ctr. For Medicare Advocacy, Inc. v. U.S. Dep't of Health & Human Servs*., 577 F. Supp. 2d 221, 231 (D.D.C. 2008); *see also Breiterman v. U.S. Capitol Police*, 323 F.R.D. 36, 47–50 (D.D.C. 2017) (applying deliberative process privilege to shield documents relating to U.S. Capitol Police Office of Inspector General report); *Hamilton Sec. Grp. v. HUD, Office of Inspector Gen*., 106 F. Supp. 2d 23, 29 (D.D.C. 2000) (extending deliberative process privilege to protect draft report compiled as part of audit conducted by Office of the Inspector General of Department of Housing and Urban Development). Movants argue that "[l]ike GAO and other agencies referenced above, the Auditor prepares documents reflecting 'advisory opinions, recommendations, and deliberations' that are part of a 'process by which Government decisions and policies are formulated,'" and the deliberative process privilege therefore applies. Dkt. 25 at 11 (quoting *Klamath Water Users Protective Ass'n*, 532 U.S. at 8).

The Court does not doubt that some—and conceivably all—of the subpoenaed documents fall within the deliberative process privilege. "[T]he deliberative process privilege," however, "does not protect documents in their entirety," and, "[f]or the . . . privilege to apply, the material must be 'predecisional' and 'deliberative.'" *Loving v. Dep't of Defense,* 550 F.3d 32, 38 (D.C. Cir. 2009). These limitations pose a problem for movants, who offer little evidence—and no detail—regarding the documents at issue. Their entire factual submission is found in four

paragraphs of a declaration from Kathleen Patterson, the current D.C. Auditor.  She attests that she has reviewed the documents and that they consist "primarily" of interview notes "with current and former DBH staff and D.C. Superior Court judges" and "notes from a court hearing." Dkt. 25-1 at 2 (Patterson Decl. ¶ 6).  These documents, according to Patterson, "reflect the thought processes of the audit team . . . and contain pre-decisional deliberations regarding the content to be included in the Report."  *Id.* (Patterson Decl. ¶ 7).  She concludes: "I believe that the disclosure of these responsive documents would seriously discourage government employees from communicating with the candor necessary for [the Office of the Auditor] to carry out its responsibilities."  *Id.* (Patterson Decl. ¶ 8).

Based on this submission, the Court cannot determine whether all of the documents at issue reflect predecisional deliberations and whether portions of any such documents can be redacted.  Do notes of a conversation with a *former* employee, for example, reflect internal, agency deliberations?  Are the interview notes verbatim or do they include the deliberative impressions of the interviewer?  If so, are there portions of the notes that can be produced that do not reflect those impressions?  Why are notes of a court hearing deliberative?  Are there any responsive documents other than "notes" taken by the CCE investigators?  Without answers to these and similar questions, the Court cannot determine which documents, and which portions of those documents, are potentially privileged.

The same is true with respect to movants' contention that the subpoenas are unduly burdensome.  The Court can understand the argument, for example, that it would "unduly" burden the auditor to require compliance because "interviews were conducted with the assurance of confidentiality," and releasing the "notes to the Plaintiff, and potentially the public, will likely diminish [the Auditor's] ability to acquire information for future audits."  Dkt. 25-1 at 2

(Patterson Decl. ¶ 8).  Movants do not indicate, however, which witnesses affirmatively requested confidentiality or whether portions of the notes could be produced with names redacted or pursuant to a suitable protective order.  They do not explain whether or how this rationale extends to notes of a court hearing.  And neither movants nor Plaintiff address whether the information at issue is "unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive."  Fed. R. Civ. P. 26(b)(2)(C).

These considerations are particularly important when considering the potential "unwanted burden thrust upon non-parties."  *Watts v. S.E.C.*, 482 F.3d 501, 509 (D.C. Cir. 2007) (quoting *Cusumano v. Microsoft Corp.*, 162 F.3d 708, 717 (1st Cir. 1998)).  Absent additional information, however, the Court cannot evaluate the extent to which the discovery Plaintiff seeks is necessary or duplicative; whether portions of the discovery can be produced without undue cost or negative consequences to movants; and whether a protective order would mitigate at least some of the asserted harm.

The Court is mindful of the sensitivities posed by Plaintiff's discovery requests.  Accordingly, although the current record cannot support movants' request that the Court quash the subpoenas, the Court will allow movants to re-file an amended motion that is supported by a more detailed showing.

## CONCLUSION

It is hereby **ORDERED** that the joint motion to quash Plaintiff's subpoena, Dkt. 20, is hereby **DENIED**.  Movants shall meet and confer with Plaintiff within 14 days and, if unable to reach a resolution, they may refile an amended motion to quash within 28 days.  It is furthe**r** **ORDERED** that Plaintiff and movants shall appear for a status conference on February 4, 2019, at 10:00 a.m. in Courtroom 21 to address the issues left open by this decision.

**SO ORDERED**.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  January 14, 2019